Filed 3/19/14  In re B.R. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re B.R. et al., Persons Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>N.R. et al.,<br><br>        Defendants and Appellants. | A139584<br><br>(Contra Costa County Super. Ct. Nos. J11-01702 & J11-01703) |

**I.**

**INTRODUCTION**

N.R. (Father) and K.C. (Mother) have filed separate appeals from orders issued by the juvenile court pursuant to Welfare and Institutions Code section 366.26,[1] terminating their parental rights to their children B.R. (then age 5) and M.R. (then age 1).  They contend the trial court erred in terminating their parental rights because they maintained regular visitation with the children, and the children would benefit from continuing their relationship.   (§ 366.26, subd.  (c)(1)(B)(i).)  We affirm.

---

[1] All statutory references are to the Welfare and Institutions Code.

## II.

## FACTS AND PROCEDURAL HISTORY

This court recently issued a nonpublished decision denying Father and Mother's writ petitions challenging the setting of the section 366.26 hearing. (*In re B.R.* (June 20, 2013) A138510.) We recite the facts underlying this dependency action, up until the section 366.26 hearing, using the factual statement from that opinion.

This family has been involved with the Contra Costa County Bureau of Children and Family Services (the Bureau) since shortly after M.R.'s birth in November 2011. The family came to the Bureau's attention because of Mother's chronic and serious alcohol dependence, multiple domestic violence altercations, and Father's inability to protect his children when their mother was intoxicated.

Originally, the children were removed from Mother's custody alone, and the court sustained a petition declaring them dependent children under section 300, subdivision (b), based on findings of drug abuse and domestic violence. Father and children moved in with the children's paternal great-grandmother. However, in violation of a court order, Father allowed Mother to care for M.R. while he went to work. Mother became intoxicated to the point of needing emergency medical attention while two-month-old M.R. was in her care. Mother's blood-alcohol level tested at .36 percent. By agreement, an allegation was then sustained against Father based on failure to protect. The children were placed with paternal relatives, where they have remained throughout these proceedings.

Reunification services were extended to both parents at the 6-month review hearing despite very minimum progress on the referrals that were offered to both parents since November 2011. Mother was referred to an inpatient substance abuse treatment program. After initial hesitation, Mother went to a program in February 2, 2012. She was discharged from the program because she tested positive for alcohol after a weekend pass. Mother then lived with Father for approximately six weeks before entering into another program. She completed the 90-day program and requested a 30-day extension. On September 26, 2012, she was discharged from the program because she tested

positive for alcohol. The next day, she was arrested for stealing from Walmart. She went to jail for 30 days. When she was released, she went back to living with Father. She admitted that she drank alcohol almost every day.

As for Father, after jurisdiction was taken, he was referred to individual counseling, drug testing and parenting education by the Bureau's social worker. He started counseling on August 21, 2012. However, he showed very little insight into his role in the removal of his children, and little commitment to his case plan. He also continued to provide support to Mother even when she was abusing alcohol.

In the report prepared for the 12-month review hearing the social worker recommended that reunification services be terminated, and that a hearing be set to determine a permanent plan for the children. It was noted that both parents were attentive and caring during their supervised visits with their children. However, neither parent had shown a commitment to fulfilling the requirements of their case plans, nor had they been able to address the issues that brought this family to the Bureau's attention. The social worker concluded that it would be detrimental to send the children home to either one of their parents when "the problem of substance abuse still exi[sts] with one parent and [the] other parent continues to ignore the issue." The report concludes with the following assessment: "Considering the seriousness of [Mother's] alcohol abuse and [Father's] inability to engage in services and in making safe decisions around [Mother's] drinking, the Bureau does not believe it would be safe to return [the children] to [their parents'] care."

The contested 12-month review hearing took place on six separate dates, beginning on January 31, and concluding on April 15, 2013. Mother testified concerning her completion of classes in domestic violence, parent education, and anger management, her participation in residential drug treatment and individual therapy, and her commitment to "live independently in a healthful manner, substance free." Mother also testified she had severed her relationship with Father, which she described as being physically and emotionally unhealthy for her. She was living in a domestic violence

shelter but was looking for a job and an apartment where her children could reside with her in an environment free of domestic violence.

Father testified that he had been living with his grandmother for the last four months. He had seen an individual therapist "[a]t least 15 times," but he terminated the sessions because he believed "that there [was] not much more to talk to him about. . . ."[2] He sporadically attended Al-Anon and Alcoholics Anonymous meetings. Even though Father was supposed to attend parenting classes, he "just didn't look for one." Although he acknowledged there was ongoing domestic violence in his relationship with Mother, he did not seek help with domestic violence issues. He testified that he recently made the determination that he was no longer going to be in a relationship with Mother. His "[m]ain priority is the kids."

The social worker testified that the parents had failed to make any significant progress on their reunification plans, and she could see no substantial probability the children could be returned to either of them within the remaining few months of the maximum 18-month reunification period.[3] Despite their claims to the contrary, the social worker believed the parents remained in a relationship, continued to see one another, and that Mother continued to abuse alcohol. The social worker testified that Father had admitted to her he and Mother had recently gone to a local casino together, and Mother had recently posted photos on Facebook of them together. Also, the social worker was "certain" that she smelled alcohol on Mother's breath after a court proceeding on March 21. The social worker expressed concern about the parents' continuing association because of ongoing problems with domestic violence and Father's pattern of being unable to set boundaries with Mother while facilitating her alcohol abuse.

---

[2] The social worker testified that Father attended eight individual therapy sessions.

[3] At the 12-month hearing, the court may continue the case for up to six months while the parent receives additional services, provided that the hearing occurs within 18 months after the child was originally taken from the physical custody of the parent. (§ 366.21, subd. (g)(1).)

At the conclusion of the hearing, the court indicated that it did not find Mother and Father to be credible witnesses. The court also noted that they had demonstrated no insight into their deficiencies as parents. As for Mother, the court characterized her as "a mean drunk" and found she is "just totally dishonest about her [substance abuse] problem. She's tried many times, been kicked out of programs, has not been honest with the court. . . ." As for Father, the court indicated "he does care about his children, but I think he cannot protect them." Addressing the parents, the court emphasized, "[y]ou don't know how to stay away from each other."

The juvenile court adopted the findings and recommendations of the Bureau, concluding there was not a substantial probability that the children could be returned to either parent's custody within the remaining month and a half, even if the court extended reunification services to the 18-month statutory maximum. The court also found that returning the children to either of their parents would be detrimental to their well-being. Reunification services were terminated, and a permanency planning hearing was scheduled for July 9, 2013, pursuant to section 366.26.

As already mentioned, the parents challenged the setting of the section 366.26 hearing by each filing a writ petition, which this court denied. (*In re B.R.*, *supra*, A138510) [nonpub. opn.].) Following our denial of the writ petitions, the juvenile court held a permanency planning hearing under section 366.26 on July 15 and 17, 2013.

In the report prepared for the section 366.26 hearing, the Bureau found the children were adoptable. It was noted that the children had been out of their parents' care for over 18 months, and had always been placed with paternal relatives. Most recently, they had been placed with the paternal uncle and his wife, who want to provide "a permanent, stable and loving home to their two nephews" by adopting them if parental rights were terminated. The children "appear[] very well cared for and the relative caretakers are very nurturing and affectionate towards the children." It was noted the children were "thriving from such devotion, care, and stability."

The Bureau's report indicated that the mother and father have maintained contact with the children via supervised visits and phone contacts. The children, especially the

5

older one, recognize their parents and enjoy visiting with them.  However, they are primarily attached to their aunt and uncle and do not hesitate to go back to them after visits with their parents.  Thus, the Bureau opined that severing parental rights in order for the children to be adopted would "not interfere with an existing parent/child relationship."

At the conclusion of the section 366.26 hearing, the court found the children were likely to be adopted, and terminated Father and Mother's parental rights.  The court rejected the parents' contention that they qualified for the beneficial parental relationship exception, under which the juvenile court may decline to terminate parental rights if it finds the termination of rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd.(c)(1)(B)(i), hereafter subdivision (c)(1)(B)(i).)  The court acknowledged "the parents have a relationship with the children. Whether . . . it's beneficial or not, I couldn't say, but it certainly does not rise to the level of overcoming the relationship that the children would have" with an adoptive family. The judge observed that the children are in "a lovely, stable, loving permanent home.  No arguing, no violence, no alcohol, no drugs and no dishonesty."

## III.

## DISCUSSION

In each of their appeals, Father and Mother contend the juvenile court should have declined to terminate their parental rights under the beneficial parental relationship exception of subdivision (c)(1)(B)(i).

Appellate courts are split as to whether abuse of discretion (see, e.g., *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 (*Jasmine D.*) or substantial evidence (see, e.g., *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575-576 (*Autumn H.*)) is the appropriate standard of review for analyzing such claims.  However, as *Jasmine D.* notes, there is little practical difference between the two tests in these circumstances: " '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling . . . .  Broad deference must be shown to the

6

trial judge.  The reviewing court should interfere only " 'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.'. . ." ' [Citations.]"  (*Id.* at p. 1351; see *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 [applying a hybrid substantial evidence/abuse of discretion standard of review].)  For purposes of the present case, it makes no difference which standard applies because the juvenile court did not err under either test.

Adoption is the strongly preferred permanent plan for dependent children who have not reunified with their parents.  "After reunification efforts have terminated, the focus shifts from family reunification toward promoting the best interests of the child.  A child has a fundamental interest in belonging to a family unit, which includes a 'placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child. [Citation.]' [Citation.]  At the selection and implementation stage, the court has three alternatives:  adoption, guardianship or long-term foster care.  [Citation.]  In selecting a permanent plan for an adoptable child, there is a strong preference for adoption over nonpermanent forms of placement.  [Citation.]" (*In  re Zachary G.* (1999) 77 Cal.App.4th 799, 808-809.)

Accordingly, the juvenile court must order adoption and termination of parental rights unless "one of the specified circumstances [in section 366.26, subdivision (c)(1)(B)] provides a compelling reason for finding that termination of parental rights would be detrimental to the child."  (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)  The exception relevant here is subdivision (c)(1)(B)(i), the beneficial parental relationship exception.

This exception applies only if the parent has developed a genuinely "*parental* relationship" with the child, rather than a merely "friendly or familiar one."  (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350, original italics.)  " 'While friendships are important, a child needs at least one parent.  Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent.' [Citation.]  Thus, a child should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be

beneficial to some degree but does not meet the child's need for a parent.  It would make no sense to forgo adoption in order to preserve parental rights in the absence of a real parental relationship."  (*Ibid.*; see similarly *In re Jason J.* (2009) 175 Cal.App.4th 922, 938 (*Jason J.*)  ["A friendly relationship, however, 'is simply not enough to outweigh the sense of security and belonging an adoptive home would provide' "]; *In re Helen W.* (2007) 150 Cal.App.4th 71, 81 ["the parent must show more than 'frequent and loving contact' . . . and be more to the child than a mere 'friendly visitor or friendly nonparent relative' "]; *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643 *Marcelo B.*) [" 'A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent' "].)

In the present case, the record shows the parents regularly visited with their children, and the parents' interactions with their children were positive.  However, by the time of the section 366.26 hearing, the children had been out of the parents' care for more than 18 months, and they had been in the prospective adoptive home for approximately 10 months.  The children were thriving in the stable and nurturing home that the prospective adoptive parents were providing them, and the children looked to them to fulfill their day-to-day physical and emotional needs.

By contrast, there was no evidence either parent could provide a safe and stable home for their children.  In terminating parental rights, the court observed that Mother was still struggling with destructive substance abuse, and that Father was co-dependent on Mother to a point rendering him incapable of protecting the children.  The court indicated, "I do not believe for a second that they will stay away from each other . . . ."  While the relationship between the parents and the children had some positive aspects, considering all of the circumstances in this case, the court could reasonably have determined that the children's need for permanence, stability and safety outweighed the benefits the children would derive from maintaining their relationship with the parents.  (See *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

8

Both parents rely on *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*), to argue that the beneficial parental relationship exception applies. In *S.B.*, a three-year-old child was removed from the custody of her father who had been her primary caregiver. The father immediately acknowledged his drug use was untenable and fully complied with his case plan, remained drug free, and regularly visited his daughter three days a week. (*Id*. at pp. 295, 298.) Even after a year apart, when the visits ended, the child continued to become upset and wanted to leave with her father. (*Id.* at p. 298.)

The appellate court in *S.B.* reversed the termination of parental rights, finding substantial evidence to support application of the subdivision (c)(1)(B)(i) exception on the basis of an emotionally significant relationship arising from the frequent and loving visits between parent and child. Rather than a visitor or playmate relationship, the court found a true parental relationship, which had developed during the first three years of the child's life, when she lived with her father, and which continued to develop while they lived apart. (*S.B.*, *supra*, 164 Cal.App.4th at pp. 298-299.) Based on this record, the court concluded, "[T]he only reasonable inference is that S.B. would be greatly harmed by the loss of her significant, positive relationship with [her father]. [Citation.]" (*Id.* at p. 301.)

Since its publication, *S.B.* has been subject to considerable criticism, particularly for its suggestion the exception applies if the child will merely "derive[ ] some measure of benefit" from the parental relationship. (*S.B.*, *supra*, 164 Cal.App.4th at p. 301.) In *Jason J.*, *supra*, 175 Cal.App.4th at page 937, the same court that decided *S.B.* cautioned: "The *S.B.* opinion must be viewed in light of its particular facts. It does not, of course, stand for the proposition that a termination order is subject to reversal whenever there is 'some measure of benefit' in continued contact between parent and child." In *In re C.F.* (2011) 193 Cal.App.4th 549 (*C.F.*), the same court once again emphasized that *S.B.* must be "confined to its extraordinary facts. [*S.B.*] does not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact." (*Id.* at pp. 558-559.)

In any event, unlike the daughter in *S.B.*, *supra*, 164 Cal.App.4th 289, there was no evidence in the record before us that the children would suffer detriment if parental rights were terminated. (*Id.* at p. 301.) The children did not display the depth of emotional attachment to their parents that S.B. displayed to her father. On the contrary, they easily separated from their parents at the conclusion of visits, and readily returned to their prospective adoptive family. Further, unlike S.B.'s father, who had "complied with 'every aspect' of his case plan," the parents here had not even begun to remedy the problems leading to the children's removal. (*Id.* at p. 298.) They have not demonstrated an ability to provide the children, over the long term, with a stable, safe and loving home environment. Accordingly, the juvenile court had ample evidentiary support in finding there was no beneficial parental relationship sufficient to overcome the statutory preference for adoption.

In conclusion, at most, all Mother and Father can demonstrate is " ' "frequent and loving contact or pleasant visits," ' " which has repeatedly been found insufficient to support application of the exception. (*Marcelo B.*, *supra*, 209 Cal.App.4th at pp. 643-644; *C.F.*, *supra*, 193 Cal.App.4th at p. 557.) Whether viewed as a matter of substantial evidence, or as a matter of abuse of discretion, we conclude that the juvenile court did not err in finding that Father and Mother failed to meet their burden of showing the parental beneficial relationship exception applied.

## III.
## DISPOSITION

The orders of the trial court are affirmed.

_____
RUVOLO, P. J.

We concur:

_____
RIVERA, J.

_____
HUMES, J.